1999 UT 40

**STATE of Utah, Plaintiff and Appellee,**

v.

**Douglas A. LOVELL, Defendant and Appellant.**

**No. 930439.**

Supreme Court of Utah.

April 23, 1999.

Rehearing Denied June 22, 1999.

Jan Graham, Att'y General, Thomas B. Brunker, Asst Att'y General, Salt Lake City, William F. Daines, Gary R. Heward, Ogden, for Appellee.

James C. Bradshaw, Salt Lake City, Karen A. Chaney, Colorado Springs, for Appellant.

DURHAM, Associate Chief Justice:

¶ 1 Appellant Douglas Anderson Lovell (Lovell) appeals from a conviction of aggravated murder and a sentence of death. Lovell contends that (1) his Sixth Amendment

right to counsel was violated because trial counsel had a conflict of interest due to personal and business associations with the prosecutor, (2) his right to counsel was also violated because the trial court failed to conduct an inquiry into complaints Lovell made about his court-appointed attorney, (3) he was denied due process of law because the trial court unconstitutionally applied the aggravating circumstances in the sentencing stage, and because Utah's death penalty scheme is unconstitutional, (4) he received ineffective assistance of counsel because trial counsel did not object to the allegedly unconstitutional application of the aggravating factors during sentencing and did not challenge the death penalty scheme. We affirm.

## FACTS

¶ 2 On June 28, 1993, Lovell pled guilty to the aggravated murder of Joyce Yost (Ms. Yost). Lovell waived his right to be sentenced by a jury and the State sought the death penalty. In a memorandum decision issued on August 5, 1993, the trial court held that (1) the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and (2) death was appropriate beyond a reasonable doubt. The trial court therefore sentenced Lovell to death.

## I. THE CRIMES

¶ 3 On April 4, 1985, Lovell, while sitting in a stolen car, observed Ms. Yost leaving a restaurant. When she drove away alone, Lovell followed Ms. Yost to her home and approached her in her driveway. Lovell invited her to have a drink with him but she refused. Lovell then forced her into the stolen car and took her to his home in Clearfield, where he raped her twice and forced her to commit sodomy. Ms. Yost reported the crimes to the police, and the State charged Lovell with aggravated kidnaping, aggravated sexual assault, and forcible sodomy.

¶ 4 In late April or early May, while awaiting a preliminary hearing on the charges against him, Lovell contacted a friend from a former prison term, William Wiswell (Billy Jack). Lovell offered Billy Jack $600 to kill Ms. Yost, and Billy Jack agreed. On May 4, 1985, Lovell and Billy Jack burglarized a home and took several guns with which they intended to murder Ms. Yost. Lovell and Billy Jack chose a night for the murder, and Billy Jack waited at Ms. Yost's apartment to kill her. Billy Jack did not carry out the murder, however, because Ms. Yost did not return home that night.

¶ 5 Sometime after this failed attempt, Billy Jack left town without telling Lovell. With the preliminary hearing approaching, Lovell continued to plan Ms. Yost's murder. Although Lovell had been separated from his wife, Rhonda Buttars (Buttars) at the time of the rape, Lovell and Buttars had resumed living together after Lovell was charged with the Yost rape. On two occasions, Lovell had Buttars drive him to Ms. Yost's apartment to find a way to get inside. On one of these occasions, he discovered an unlocked kitchen window. He then asked another friend from prison, Tom Peters (Peters), to murder Ms. Yost. Peters agreed to murder Ms. Yost for $600 to $800. Lovell obtained the money through a fraudulent workers compensation claim and gave it to Peters. Lovell told Peters how to get into Ms. Yost's apartment, and on the planned night, Lovell went to a family gathering to establish an alibi. Peters, however, did not kill Ms. Yost but spent the money on heroin. The preliminary hearing was held as scheduled. Ms. Yost testified against Lovell, and the court bound Lovell over for trial.

¶ 6 Sometime after Peters failed to perform the murder, Lovell decided to murder Ms. Yost himself. On August 10, 1985, Buttars drove Lovell to Ms. Yost's apartment and dropped him off around midnight. Buttars then drove back home and went to bed. Lovell, wearing a stocking on his head, broke into Ms. Yost's apartment through the unlocked kitchen window. He went to Ms. Yost's bed where she was asleep, put his hand over her mouth and held a knife over her. Ms. Yost started when she awoke and cut her hand on the knife. Her blood soaked the sheets and mattress.

¶ 7 Ms. Yost pleaded with Lovell for her life and offered to drop the sexual assault charges. Lovell told Ms. Yost he would not

kill her and gave her some Valium. Lovell then gathered up the blood-soaked sheets, turned over the mattress, and made the bed with fresh linens. He packed a suitcase to make the police believe Ms. Yost had left of her own accord. Lovell then drove Ms. Yost to a canyon outside of Ogden and strangled her. Lovell covered Ms. Yost's body with leaves and left her on the mountainside.

¶ 8 Some time after the murder, Lovell took a shovel back to the murder site, stole Ms. Yost's watch, and buried her body. Police never found Ms. Yost's body. On December 13, 1985, Lovell was convicted of the kidnapping and sexual assault of Ms. Yost based on her preliminary hearing testimony.

## II. THE MURDER INVESTIGATION AND GUILTY PLEA

¶ 9 Lovell was the primary suspect when Ms. Yost disappeared, but the investigation did not make any progress for several years. In January 1988, Detective Terry Carpenter (Carpenter) became the lead detective on the case. In April 1991, Carpenter contacted Buttars, who had divorced Lovell in 1990. Carpenter offered Buttars immunity if she testified about the murder provided Buttars had not been the one to "pull the trigger." Buttars then told Carpenter about the murder and that Lovell had strangled Ms. Yost.

¶ 10 After Buttars' admission, Detective Carpenter visited Lovell in prison in May 1991 to question him about Ms. Yost's disappearance. Lovell refused to talk to Carpenter, but after Carpenter's visit, he began calling Buttars asking her to visit him at the prison. At the request of Detective Carpenter, Buttars recorded her conversations with Lovell during visits in June 1991 and January 1992. Lovell made incriminating statements in both conversations. For example, Lovell speculated that Billy Jack might have given police information about the murder, but that "Billy doesn't know that I did it. Billy doesn't know, neither does Tom. Nobody knows. You [referring to Buttars] was the only one. You're the only one that can get on the stand and say, 'that's him.'" Lovell also stated, "I committed a first degree felony to cover another felony. It's the death penalty ... I premeditated—premeditated. I planned to kill Joyce. I planned to end Joyce's life. That's premeditated capital homicide." During these discussions, Lovell did not disclose the location of Ms. Yost's body. On May 14, 1992, the State charged Lovell with Ms. Yost's murder.

## PROCEDURAL HISTORY

¶ 11 On December 10, 1992, Lovell's appointed trial counsel, John Caine (Caine) moved to suppress Lovell's recorded statements and Buttars' testimony. The trial court denied the motion, and Lovell petitioned for interlocutory review. The petition for interlocutory appeal was denied on March 26, 1993.

¶ 12 While the petition for interlocutory appeal was pending, Caine and the prosecution discussed the possibility of a plea bargain. Some time in January 1993, the prosecutor, Reed Richards (Richards), indicated to Caine that the only basis upon which they might fashion an agreement would be the returning of Ms. Yost's body to her family. When Caine gave this information to Lovell, Lovell assured Caine that he could locate Ms. Yost's body "in a snowstorm." No agreement was reached, however, and in February of 1993, Richards was injured and incapacitated. He subsequently left the prosecutors office and was not involved in the case any time after early February 1993.

¶ 13 After Richards left the case, Caine continued to work with the prosecution toward a plea agreement. On March 29, 1993, Lovell appeared before the trial court to discuss the denial of his interlocutory appeal. Lovell contends that he believed he had a plea agreement and would plead guilty on that date; however, no agreement was reached at that time. On April 14, 1993, the trial date was set for June 28, 1993, but the parties agreed to try to resolve the case before trial. On June 17, 1993, Lovell signed a memorandum of understanding, which required him to lead police to Ms. Yost's remains, to plead guilty to aggravated murder, and to accept a sentence of life without the possibility of parole. In exchange, the State agreed not to introduce any evidence in support of the death penalty and to dismiss the

aggravated kidnapping charge. The agreement also provided that Lovell's failure to find the body would void the agreement.

¶ 14 Meanwhile, on May 7, 1993, the trial court received a letter from Lovell. In the letter, Lovell stated he wanted to defend himself. Lovell claimed he had confessed to Ms. Yost's murder to Detective Carpenter in reliance on Caine's representation that the parties had reached a plea agreement at his March hearing. Lovell confessed to Carpenter on the day of the March hearing during a chance meeting with the detective. Although Carpenter discouraged the conversation because Lovell's counsel was not present, Lovell said, "I can talk to you if I want." At that time, Lovell also told Carpenter that he had already confessed the murder to his father.

¶ 15 By the June trial date, after numerous attempts using his best efforts, Lovell had failed to lead police to Ms. Yost's remains. Although that failure voided his agreement to plead guilty, Lovell pleaded guilty to aggravated murder anyway. The trial court accepted the guilty plea, and Lovell waived his right to be sentenced by a jury.

## I. SENTENCING PHASE

¶ 16 The trial court found that the evidence established the following statutorily-defined aggravating circumstances: (1) Lovell murdered Ms. Yost while committing an aggravated burglary and aggravated kidnaping (Utah Code Ann. § 76–5–202(d)); (2) Lovell murdered Ms. Yost for the personal gain of avoiding incarceration (Utah Code Ann. § 76–5–202(f)); (3) defendant had a prior conviction for the violent felony of aggravated robbery (Utah Code Ann. § 76–5–202(h)); and (4) Lovell murdered Ms. Yost to prevent her from testifying at trial and in retaliation for providing evidence against defendant (Utah Code Ann. § 76–5–202(i)). The trial court did not find that the evidence satisfied the "especially heinous" (Utah Code Ann. § 76–5–202(q)) or "murder-for-hire" (Utah Code Ann. § 76–5–202(g)) aggravators, but did rely on Lovell's "cold-blooded" planning and his contracting with two other men to kill Ms. Yost as additional aggravating factors.

¶ 17 The defense presented four theories in mitigation: (1) sentencing Lovell to death would punish him disproportionately to Ms. Buttars, who had received immunity; (2) Lovell's difficult childhood led to his criminal activities; (3) Lovell had done all he could to return Ms. Yost's body to her family; and (4) Lovell had become a better person during his incarceration and had much to offer society. Lovell focused primarily on his third and fourth arguments, contending that he was truly penitent and had become a better person during his incarceration. In rebuttal, the State argued that Lovell's attempts to change did not begin until after his arrest on the murder charges, and that Lovell only wanted to build a mitigation case.

¶ 18 The trial court analyzed the evidence and recognized that the most serious issue at sentencing was whether defendant was a changed person. The trial court observed that Lovell's willingness to cooperate had come only when it was clear the State had such overwhelming evidence against him that he had only a remote chance of prevailing at trial or sentencing. Therefore, the trial court concluded that *no* statutory mitigating factors were present and sentenced Lovell to death.

## II. RULE 23(b) REMAND

¶ 19 After his sentencing, Lovell requested a withdrawal of his guilty plea and appealed his sentence to this Court. Lovell sought a limited remand in order to develop a record on ineffective assistance of counsel issues and to allow a hearing on his plea withdrawal request. In January 1995, pursuant to Rule 23B of the Utah Rules of Appellate Procedure, this Court granted the motion with regard only to the issue of "defendant's allegation of conflict of interest between defense counsel and the Weber County attorney." The district court held evidentiary hearings and heard argument from the parties in 1996 and 1997, and entered its findings of fact on March 21, 1997.

## ANALYSIS

¶ 20 On appeal, Lovell claims that trial counsel's associations with one of the prose-

cutors caused a conflict of interest, and that the trial court's failure to inquire into Lovell's complaints about counsel violated his Sixth Amendment rights. Lovell also claims he was denied due process in the sentencing phase, and that counsel's failure to object to the sentencing process constituted ineffective assistance.

## I. CONFLICT OF INTEREST

¶ 21 Lovell argues that his trial counsel had extensive personal associations with prosecutor Reed Richards and that the relationship denied Lovell his constitutional right to conflict-free counsel.

■ ¶ 22 The right to conflict-free representation is guaranteed by the Sixth Amendment. *See Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *United States v. Burney*, 756 F.2d 787, 790 (10th Cir.1985). However, in order to show this right was violated, Lovell must establish both that Caine had an actual conflict of interest, and that the conflict adversely affected Caine's performance. *See State v. Taylor*, 947 P.2d 681, 686 (Utah 1997). To establish an actual conflict of interest, Lovell must show that Caine had to make choices that would advance his own interests to the detriment of Lovell's. *See Id.* Having remanded this case for an evidentiary hearing on the conflict issue under Rule 23B of the Utah Rules of Appellate Procedure, we defer to the trial court's findings of fact but treat the conflict issue as a question of law. *See State v. Taylor*, 947 P.2d at 685 (Utah 1997) (deferring to trial court's findings after 23B remand).

■ ¶ 23 The trial court found that the record does not establish that Caine had an actual conflict nor that any conflict adversely affected Caine's performance. Lovell's claims of conflict stem from a lengthy personal and professional relationship between Caine and Richards. Caine and Richards jointly owned real estate properties; Richards assisted Caine in preparing his personal and business tax returns; Caine had participated in Richards' campaigns for county attorney; Caine and Richards had previously taught college courses together and had practiced law together. Lovell also contends that Richards had access to Caine's client files during the time of trial. Also, at that time, Caine's partners were relatives of Richards; Richards' office was in the same building as Caine's firm although on a separate floor; and Richards had access to the copy machine belonging to Caine's firm.

¶ 24 Although Richards and Caine were friends and business associates, Lovell fails to establish that Caine's ties to Richards forced Caine to make any choice that advanced his interests to the detriment of Lovell's. Determining whether any conflict adversely affected Caine's performance turns on whether (1) other counsel likely would have approached the case differently and (2) a tactical reason other than the alleged conflict existed for Caine's decisions. *See State v. Webb*, 790 P.2d 65, 76 (Utah Ct.App.1990). The record shows that because the State had such a strong case against Lovell, it was in Lovell's best interest to work toward a plea agreement with the prosecution. Caine did everything he could to obtain a favorable plea bargain, and it is not apparent that other counsel could or would have approached the case differently. Furthermore, Caine's decisions were obviously guided by the tactic of trying to avoid the death penalty. Because Lovell did not establish that other counsel would have approached the case differently or that Caine's decisions were not guided by professionally acceptable tactical reasons, Lovell fails to establish that Caine's performance was adversely affected in any way by his association with Richards.

¶ 25 At the 23B hearing, the trial court found that Caine had discussed with Lovell his relationship with Richards. Although Caine did not specifically discuss his relationship with Richards' family in the law firm, his and Richards' joint property holdings, or their joint teaching and tax preparation relationships in the past, Caine explained to Lovell that Richards was his good friend. The trial court found that Lovell knew about Caine's relationship with Richards and thought that the relationship could actually benefit his defense. The trial court also found that Richards did not have access to Caine's files and that the files were kept in a

part of the building to which Richards did not have access. There is nothing in the record that suggests Caine or Richards acted improperly or that Caine could have gained any benefit by acting to the detriment of Lovell's interests in his dealings with the prosecution.

¶ 26 Lovell also claims that Caine's representation of him in this case created the "appearance of impropriety." However, *Taylor* makes clear that an actual conflict is required to show ineffective assistance of counsel. *See* 947 P.2d at 686. Lovell fails to demonstrate an actual conflict of interest that adversely affected Caine's performance; Lovell's conflict claim therefore fails.

## II. FAILURE TO INQUIRE

¶ 27 Lovell argues that the trial court's failure to inquire into his dissatisfaction with counsel was reversible error. Although a failure to inquire into dissatisfaction with counsel is error, we find that the facts of this case do not warrant reversal. As the Utah Court of Appeals has properly held, when a defendant expresses dissatisfaction with counsel, a trial court "must make some reasonable, non-suggestive efforts to determine the nature of the defendant's complaints." *State v. Pursifell,* 746 P.2d 270, 273 (Utah Ct.App.1987) (holding that trial court's failure to inquire deeply into defendant's reasons for dissatisfaction with counsel was not reversible error where defendant's complaints were insubstantial). We agree with the court of appeals and emphasize that trial courts in all cases should conduct specific inquiry. Although the trial court should have addressed Lovell's letter on the record in this case, we conclude that the failure to inquire was not harmful to Lovell given the circumstances of this case.

¶ 28 Lovell's letter can be interpreted in two ways: a request to represent himself, or a request for substitute counsel. Either way, the failure to inquire does not warrant reversal. If we treat Lovell's letter as a request to proceed pro se, the trial court's failure to inquire does not violate Lovell's Sixth Amendment right to self-representation. It is clear that a defendant may waive

the right to counsel. *See United States v. Allen,* 895 F.2d 1577, 1578 (10th Cir.1990). It is also well established that before allowing a defendant to proceed pro se, the judge "must ensure and establish on the record that defendant 'knows what he is doing and [that] his choice is made with eyes open.' " *See id.* (quoting *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). The purpose of this requirement is to ensure that the defendant has a sense of the "magnitude of the undertaking and the hazards inherent in self-representation" when choosing to proceed pro se. *See id.* (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948)). The failure to inquire is reversible when the defendant proceeds pro se without making a "voluntary, knowing and intelligent" waiver. *See Allen,* 895 F.2d at 1578 (reversing conviction when defendant was not represented by counsel and trial court had not ensured a knowing, voluntary waiver). Since Lovell did *not* represent himself but was represented by counsel, the trial court's failure to inquire does not require reversal on this theory.

¶ 29 Likewise, if we view the letter as a request for substitute counsel, the failure to inquire is not reversible error. This case is similar to *United States v. Young,* 482 F.2d 993 (5th Cir.1973). During trial in that case, the defendant claimed that his attorney had disclosed confidential defense matters to the prosecution. The trial judge summarily rejected this contention based on his longstanding professional acquaintance with the attorney in question. In reviewing the failure to inquire into defendant's seemingly substantial complaint about counsel, the circuit court held that, "[n]ormally, failure to conduct such an inquiry constitutes reversible error." *Id.* at 995 (citing *United States v. Morrissey,* 461 F.2d 666, 669 (2d Cir. 1972)). However, because the record as a whole reflected that the defendant "received vigorous and able representation at trial," the circuit court found that no prejudice resulted from the failure to conduct an inquiry, and reversal was not required. *Id.* at 669–70.

¶ 30 Likewise, in *Pursifell, supra,* the defendant claimed that counsel had not pre-

pared adequately for his case. The defendant based this allegation on the fact that he had met with counsel just once before trial. The *Pursifell* court held that the trial court's failure to inquire deeply into this allegation did not constitute reversible error since a single meeting was not, on its face, indicative of a lack of preparation in the case. 746 P.2d at 273–74. Based on the record, the *Pursifell* court held that defendant's "dissatisfaction with counsel was not so substantial as to rise to a constitutional level requiring the appointment of new counsel." *Id.* at 274. Therefore, as in Lovell's case, "[w]hile it might have been preferable to delve deeper into defendant's arguable claim of inadequate preparation, the failure to do so was neither a constitutional violation nor an abuse of discretion." *Id.* at 274.

¶ 31 Lovell's only expression of dissatisfaction is found in his letter to the trial court. In the letter, Lovell claimed he had had a "misunderstanding" with counsel regarding his plea agreement. Lovell asserted he had confessed to Ms. Yost's murder to several people because he believed he had already reached a plea agreement with the State. Lovell also mentioned an earlier misunderstanding with counsel regarding another failed plea agreement. However, as the trial court found, no plea agreement had been finalized, and Lovell had no reason to believe that an agreement had been reached. As in *Pursifell*, Lovell's allegations do not rise to a constitutional level requiring the appointment of new counsel. It is well established that to warrant substitution of counsel, a defendant "must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *Young*, 482 F.2d at 995 (citing *Brown v. Craven*, 424 F.2d 1166 (9th Cir.1970)). Lovell's claims of misunderstandings do not amount to a conflict of interest or a complete breakdown in communication.

¶ 32 In fact, after he sent the letter to the trial court, Lovell appeared to be satisfied with counsel. Less than one month after the court received the letter, Lovell appeared at a pretrial conference with counsel and made no mention of the letter or of any complaints about his counsel. Similarly, less than two months after sending the letter, Lovell had a plea colloquy with the trial court in which he affirmed that he was satisfied with counsel and that counsel had performed competently.

¶ 33 Furthermore, the record does not show that failure to substitute counsel resulted in an apparently unjust verdict. The record shows that Lovell had already implicated himself in the murder in recorded statements long before he was charged with the crime. This evidence was to be used at trial. Given these facts, the record shows that counsel vigorously and ably represented Lovell. Because the evidence was so overwhelmingly conclusive regarding Lovell's guilt, counsel did everything he could to obtain a favorable plea agreement for Lovell. Counsel even obtained a preliminary agreement with the State in which Lovell would receive a life sentence with the possibility of parole if Lovell could produce Ms. Yost's remains. Counsel based this agreement on Lovell's representation that he could find Ms. Yost's body "in a snowstorm." Lovell knew that his failure to find Ms. Yost's remains would void the agreement.

¶ 34 In addition, Lovell claimed in his letter that a misunderstanding regarding a plea agreement at his hearing on March 29, 1993 caused him to confess to the murder to several people. Lovell now claims that these confessions compromised his position. The trial court found, however, that there was no factual predicate for Lovell's claim, because no offer of settlement was pending on that date, and Lovell was never told otherwise. Furthermore, Lovell knew that any agreement would require him to produce Ms. Yost's body before he received any sentencing concession. And yet, before any agreements had been reached, and before he had attempted to find the body, Lovell confessed to Ms. Yost's murder. It is apparent from the record that Lovell could not have prevailed at trial or received a lesser sentence even without these confessions, given the facts of his crime and the evidence against him.

¶ 35 The trial court did not violate Lovell's Sixth Amendment right to counsel by not conducting an inquiry regarding the necessi-

ty for substitute counsel. There is nothing in the record to suggest an irreconcilable conflict of interest or a complete breakdown of communication between Lovell and Caine. Also, there is no indication that had an inquiry been conducted or had counsel been substituted, the outcome would have been any better for Lovell. Therefore, the failure to inquire was harmless error.

## III. SENTENCING

¶ 36 Lovell argues that he was denied due process of law during the sentencing phase of his conviction. He claims: (1) the Utah Death Penalty Scheme is unconstitutional because it fails to narrow the class of persons eligible for the death penalty and to channel the sentencer's discretion, and the "personal gain" (Utah Code Ann. § 76–5–202(1)(f)) and "especially heinous" (Utah Code Ann. § 76–5–202(1)(q)) aggravators are unconstitutionally vague and overbroad; (2) the trial court unconstitutionally applied the "especially heinous" (Utah Code Ann. § 76–5–202(1)(q)) and "murder for hire" (Utah Code Ann. § 76–5–202(1)(g)) aggravators in this case; (3) the trial court improperly applied both the "personal gain" (Utah Code Ann. § 76–5–202(1)(f)) and "killing a witness" (Utah Code Ann. § 76–5–202(1)(i)) aggravators to the same underlying acts; and (4) trial counsel rendered ineffective assistance by failing to object to the sentence imposed by the trial court.

■ ¶ 37 Lovell did not raise any constitutional challenges in the trial court. However, in a death penalty case,

[t]his Court will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard. In addition, this Court has the power to notice manifest ("palpable") error apparent in the record and correct a conviction based upon the same if the error is prejudicial, even though such error is not objected to at trial or assigned on appeal.

*State v. Carter,* 776 P.2d 886, 888 (Utah 1989) (citing 5 Am.Jur.2d Appeal & Error, § 901, at 338 and cases cited therein). Under this standard, we find that reversal is not warranted.

## UTAH'S DEATH PENALTY SCHEME

¶ 38 Lovell argues that the Utah death penalty statute insufficiently narrows the class of persons eligible for the death penalty. However, the constitutionality of Utah's death penalty scheme has already been considered and upheld by this Court. *State v. Young,* 853 P.2d 327, 336–38 (Utah 1993). In *Young,* a majority of this Court[1] held that under both the state and federal constitutions, "the death penalty under the Utah statutory scheme is constitutional." *Id.* at 337–38. Furthermore, the statute's constitutionality under the federal constitution has been upheld by the Tenth Circuit. *See Andrews v. Shulsen,* 802 F.2d 1256, 1261–62 (10th Cir.1986), *cert. denied,* 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988). Since this issue has already been decided, we will not readdress it at this time.

¶ 39 Lovell further argues that the "personal gain" and "especially heinous" aggravators are facially vague and overbroad. The constitutionality of the "personal gain" aggravating circumstance has been challenged and upheld on federal grounds. *See Andrews v. Shulsen,* 600 F.Supp. 408, 424 (D.Utah 1984) (relying on "other personal gain" as one of the aggravating circumstances at the guilt phase), *aff'd,* 802 F.2d 1256 (10th Cir.1986). In *Andrews,* the district court held that the "personal gain" aggravator constitutionally narrowed the class of persons eligible for the death penalty after defining the "personal gain" circumstance as a "killing so as to gain a substantial advantage or to rid oneself of substantial difficulty [such as] to silence a witness." *Andrews,* 600 F.Supp. at 424.

¶ 40 Likewise, the constitutionality of the "especially heinous" aggravating circumstance has been upheld by this Court. *See*

---

1. The author still subscribes to the analysis in her dissent in *State v. Young,* which concludes that Utah's statute does not meaningfully narrow the class of death-eligible murders. *See* 853 P.2d at 399.

*State v. Tuttle*, 780 P.2d 1203, 1217–18 (Utah 1989) (limiting construction of the "especially heinous" aggravating circumstance). This Court has held that the limited construction of the "especially heinous" circumstance adopted in *Tuttle* sufficiently narrowed the meaning of the aggravating circumstance. *Id.* Because these issues have already been resolved, the trial court committed no obvious error by not ruling sua sponte that any part of the Utah death penalty scheme was unconstitutional.

## APPLICATION OF "ESPECIALLY HEINOUS" AND "MURDER FOR HIRE" AGGRAVATORS

¶ 41 Lovell claims that the trial court improperly applied both the "especially heinous" and the "murder for hire" aggravating factors in the sentencing process. However, the trial court did not find that the facts of Lovell's case met the "especially heinous" circumstance. Instead, the trial court noted that the cold-blooded nature of Lovell's crime probably did not meet the criteria for use of the "especially heinous" aggravator but that it could be considered as aggravating evidence under the provision allowing the court to consider "any evidence in mitigation or aggravation." Utah Code Ann. § 76–3–207(2) (Supp.1993). Therefore, even if the trial court had ruled erroneously on the "especially heinous" circumstance, no harm was done. *See State v. Menzies*, 889 P.2d 393, 405 (Utah 1994) (finding it doubtful that the trial court relied on heinousness as an aggravator, but finding any error harmless beyond a reasonable doubt because the trial court could rely on the same evidence as a circumstance of the crime), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).

¶ 42 Lovell also argues that the trial court violated his due process rights by relying on the "especially heinous" aggravator when it had not been alleged by the prosecution. Due process requires the prosecution to allege a circumstance so that the defendant has adequate notice to prepare a defense. *See Lankford v. Idaho*, 500 U.S. 110, 120–28, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991). However, Lovell has not shown that the alleged lack of notice affected or im-

paired his preparation. In fact, he effectively admitted all of the evidence that the trial court relied on regarding the nature of his crime. This evidence could have been relied on as a general aggravating circumstance, so again, any error is harmless beyond a reasonable doubt.

¶ 43 Similarly, the trial court did not rely explicitly on the "murder for hire" aggravating circumstance. The trial court recognized that the individuals Lovell hired to kill Ms. Yost did not carry out the murder, but further noted that, although the circumstance may not meet the requirements of the "murder for hire" aggravating circumstance, the court could still consider the evidence of the murder contracts as having relevance to the sentence or penalty with the same net effect. This was not error.

## APPLYING TWO AGGRAVATORS TO THE SAME UNDERLYING ACTS

¶ 44 Lovell argues that the trial court erred by concluding that the fact that Lovell murdered Ms. Yost to prevent her from testifying against him made both the "personal gain" and "killing a witness" aggravators applicable. Lovell claims that this violated the constitutional prohibition against the "double-counting of a single act of the defendant." *Parsons v. Barnes*, 871 P.2d 516 (Utah 1994), *cert. denied*, 513 U.S. 966, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994).

¶ 45 Even if the trial court wrongly counted the same fact for two different aggravators, any error is harmless beyond a reasonable doubt. By weighing the totality of the aggravating circumstances against the totality of the mitigating circumstances, "not in terms of the relative numbers of the aggravating and mitigating factors, but in terms of their respective substantiality and persuasiveness," the trial court found that death was appropriate beyond a reasonable doubt. *State v. Wood*, 648 P.2d 71, 83 (holding that sentencing authority must decide how "compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors"). Even if only counted once, the motive for this murder was sufficiently egre-

gious to permit the imposition of the death penalty. *See State v. Archuleta,* 850 P.2d 1232, 1248 (Utah 1993) ("we can confidently say beyond a reasonable doubt that even if the jury had not considered the invalid aggravator, it would have returned a verdict of death"), *cert. denied,* 510 U.S. 979, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993). The trial court found overwhelming aggravating evidence and rejected all of Lovell's mitigation theories. As in *Archuleta,* leaving out the "personal gain" aggravator would not have reduced Lovell's sentence, so any error is harmless beyond a reasonable doubt.

## INEFFECTIVE ASSISTANCE

¶ 46 Lovell claims that his trial counsel performed ineffectively because he did not raise the constitutional challenges to the specific aggravating circumstances that Lovell raises on appeal. In order to prove his claim, Lovell must identify specific acts or omissions by counsel which fell below an objective standard of reasonableness, overcoming the presumption that counsel rendered constitutionally adequate assistance. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Furthermore, under *Strickland,* Lovell must also affirmatively prove that the challenged acts or omissions undermine confidence in the outcome of his trial. *See Id.* at 694, 104 S.Ct. 2052. As we have discussed, Lovell's counsel had no basis on which to challenge the constitutionality of the death penalty statute, including the specific aggravators. The constitutionality of the statute has been upheld by this Court, so counsel had no reason to believe he could make a legitimate constitutional challenge. As we have noted, the trial court could and did consider all the evidence in the case under the general sentencing provision, without relying explicitly on the specific aggravators *as* aggravators challenged by Lovell. Lovell fails to establish that his counsel's failure to challenge the statutory provisions fell below an objective standard of reasonableness. Therefore, Lovell's claim does not overcome the strong presumption that counsel performed adequately; Lovell's constitutional claims must fail.

## CONCLUSION

¶ 47 Because we find that all of Lovell's claims fail, we affirm his conviction and sentence of death.

Chief Justice HOWE, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Associate Chief Justice DURHAM's opinion.

