2008 UT 27

**STATE of Utah, Plaintiff, Appellee, and Cross–Petitioner,**

v.

**Wade MAUGHAN, Defendant, Appellant, and Cross–Respondent.**

Nos. 20060189, 20060216.

Supreme Court of Utah.

April 1, 2008.

Mark L. Shurtleff, Att'y Gen., Thomas B. Brunker, Asst. Att'y Gen., Salt Lake City, Brad C. Smith, H. Thomas Stevenson, Ogden, Benjamin C. Rasmussen, Draper, for plaintiff.

Richard P. Mauro, Scott C. Williams, Salt Lake City, for defendant.

Kent R. Hart, Salt Lake City, for amicus Utah Ass'n of Criminal Defense Lawyers.

NEHRING, Justice:

¶ 1 In this appeal, we consider whether the district court exceeded its discretion when it required Wade Maughan, a defendant in a capital murder case, to discharge one of his two court-appointed lawyers after the State moved to have them disqualified because of

their alleged conflicts of interest. Both the State and Mr. Maughan were unhappy with the district court's ruling: the State because it believed that both of Mr. Maughan's attorneys, Richard Mauro and Scott Williams, merited disqualification; and Mr. Maughan because he thought neither should have been dismissed. We conclude that the district court did not abuse its discretion in determining that Mr. Mauro's and Mr. Williams' continued representation would neither create an actual conflict of interest nor compromise the integrity of the judicial process. Although we affirm the district court's conclusion that a potential conflict of interest might exist, we view the identified conflict to be of very little consequence and therefore waivable.

## BACKGROUND

### I. FACTUAL SETTING OF THE STATE'S MOTION TO DISQUALIFY MR. MAUGHAN'S LAWYERS

¶ 2 Wade Maughan was charged with murder in the first degree, a capital offense, and aggravated robbery for killing Bradley Perry, a convenience store clerk in Perry, Utah, in May 1984. Mr. Maughan awaits trial on these and other charges in Box Elder County, Utah, while his choice of counsel remains in doubt.

¶ 3 Mr. Maughan came to the attention of law enforcement authorities after DNA testing matched blood at the murder scene to that of Glen Griffin. During their investigation of the Griffin case, Box Elder County detectives interviewed Mr. Maughan in Spokane, Washington. Mr. Maughan told the detectives that he helped Mr. Griffin plan the robbery of the convenience store and was present when Mr. Griffin killed Mr. Perry. With this statement in hand, the State charged Mr. Maughan with murder in the first degree, a capital offense, and aggravated robbery.

¶ 4 Mr. Maughan is an indigent individual facing a possible capital sentence, and rule 8 of the Utah Rules of Criminal Procedure guarantees him the assistance of at least two court-appointed defense attorneys who are "proficient in the trial of capital cases." Richard Mauro and Scott Williams, both members of the disappointingly small corps of attorneys in Utah who have sought and attained eligibility to represent defendants in capital cases, agreed to take on Mr. Maughan's representation.

¶ 5 On December 5, 2005, within hours of being engaged to represent Mr. Maughan, Mr. Mauro and Ted Cilwick, an investigator, traveled to Spokane to interview those close to Mr. Maughan, including Mr. Maughan's girlfriend, Lorraine Rima, and another friend, Randy Wagar. At the same time, the Spokane Police Department, at the request of the Box Elder County Sheriff's Office, also sought out the same witnesses.

¶ 6 Mere hours before Mr. Mauro and Mr. Cilwick's flight was scheduled to arrive in Spokane, Detective Mark Burbridge of the Spokane Police Department interviewed Ms. Rima. During the interview, Ms. Rima identified Mr. Wagar as a mutual friend of Mr. Maughan's and hers. She said that during a visit at the jail, Mr. Maughan told Mr. Wagar that he had been present during the robbery and murder of Mr. Perry. Ms. Rima told Detective Burbridge where to find Mr. Wagar. After concluding the interview with Ms. Rima, Detective Burbridge went to Mr. Wagar's residence and, failing to contact him there, left a business card.

¶ 7 That same evening, Mr. Mauro and Mr. Cilwick met with Ms. Rima, Mr. Wagar, and Alta Raney, Mr. Wagar's mother. The details of their conversation are a matter of some dispute. Mr. Mauro and Mr. Cilwick apparently advised the three individuals against talking to "anyone," which allegedly was taken to include the police.

¶ 8 The next day, Detective Burbridge received a voicemail from Mr. Wagar expressing a willingness to talk. When Detective Burbridge and a colleague met with Mr. Wagar later that day, Mr. Wagar had changed his mind. By Detective Burbridge's account, Mr. Wagar said that Mr. Maughan's attorneys advised him not to talk to the police. After Detective Burbridge explained that, as a witness, Mr. Wagar could be charged with obstruction of justice for refusing to talk to the police, Mr. Wagar relented. He told the

detectives that Mr. Maughan had said that he, Mr. Griffin, and an unnamed third man had entered the convenience store and that Mr. Griffin had stabbed Mr. Perry after an argument over ten dollars. Detective Burbridge returned to Ms. Rima's house and discovered that she, too, had met with Mr. Maughan's attorneys and was unwilling to talk to the police.

¶ 9 A Spokane police officer contacted Mr. Mauro and Mr. Cilwick that evening to question them about their contact with the witnesses. Mr. Mauro allegedly refused to discuss the matter. The police officer arrested Mr. Mauro and Mr. Cilwick, accusing them of witness tampering. The men were later released. According to the State, the State of Washington was required to charge Mr. Mauro and Mr. Cilwick within ninety days of their arrest. More than two years have now passed since the arrest, and no charges have been filed against either man.

¶ 10 The Spokane detectives returned to Mr. Wagar's house two days later and learned that additional members of the defense team—Mr. Williams and an investigator named Charles Schlessinger—had visited Mr. Wagar. According to Mr. Wagar, Mr. Williams and Mr. Schlessinger explained that there had been a misunderstanding and that Mr. Wagar should feel free to talk to the police. Whatever the precise content of the conversations between the witnesses, Mr. Maughan's lawyers, and investigators may have been, all of the witnesses were soon willing to, and in fact did, talk freely to the police.

## II. PROCEDURAL HISTORY OF THE STATE'S MOTION TO DISQUALIFY MR. MAUGHAN'S LAWYERS

¶ 11 In short order, the State filed a motion to disqualify Mr. Mauro and Mr. Williams. The State contended that the conduct of Mr. Mauro and Mr. Williams created an actual conflict of interest or presented a serious potential conflict that could only be avoided through disqualification.

¶ 12 The State described several conflicts. Regardless of whether the lawyers would ever find themselves facing prosecution for an offense stemming from their conversations with the Spokane witnesses, the State contended that the focus of the lawyers' energies would shift from Mr. Maughan to themselves to a degree that might result in leaving Mr. Maughan without effective counsel. The State also advanced the prospect that prosecutors might be compelled to explore the substance of the lawyers' conversations with the witnesses during redirect examination. The State notes that it would have an interest in exposing the bias of Mr. Maughan's friend, Mr. Wagar. Mr. Wagar's willingness to comply with the alleged admonition of Mr. Mauro to refuse to talk to the Spokane detectives would, in the State's view, reinforce the case that Mr. Wagar's testimony would likely be tainted by his allegiance to Mr. Maughan. Once the conversation with Mr. Mauro was disclosed, the State conjectured, disclosure of Mr. Mauro's arrest would not be far behind. That would create, as the State's counsel stated during the hearing before the district court, "an impossible position for [Mr. Mauro]."

¶ 13 As for Mr. Williams, the State saw a conflict of interest lurking in the statements made by the Spokane witnesses after their meeting with Mr. Williams that their "confusion" caused their belief that Mr. Mauro had instructed them not to talk to the police. And in the event that the subject of Mr. Mauro's statements might arise during the redirect examination of any of the Spokane witnesses, the State contends that the circumstances giving rise to the witnesses' change of heart might also surface. To the extent that Mr. Williams' meeting with Mr. Wagar contributed to his decision to talk to the police and to the extent that Mr. Williams persuaded Mr. Wagar that he was "confused," the State argues that Mr. Williams' effectiveness as counsel might be called into question. Even if Mr. Williams' statements to Mr. Wagar were intended to clear up a misunderstanding about the nature and scope of Mr. Mauro's admonition rather than to persuade Mr. Wagar that he was "confused" about Mr. Mauro's instructions to bar communicating with the police, Mr. Williams' representation would still, in the view of the State, constitute an existing or potential conflict.

¶14 Finally, the State offered up as a ground for the lawyers' disqualification the unsubstantiated claim by a female friend of Mr. Griffin that Mr. Mauro had come to her home on the morning of his first appearance as Mr. Maughan's lawyer and falsely represented himself to be a television reporter. The State suggested in its motion that Mr. Williams might have also been involved in the alleged ruse as the driver of the SUV that transported the person identified as Mr. Mauro to the woman's home. This story proved to be a complete fabrication, and, to the State's credit, its counsel acknowledged as much at the hearing on the motion to disqualify the lawyers.

¶15 Throughout these proceedings, Mr. Maughan expressed his desire to retain both Mr. Mauro and Mr. Williams as counsel. As Mr. Mauro explained to the district court, Mr. Maughan recognized that he had formed a relationship with the two attorneys, they had worked extensively on his case, and they had established a rapport with members of his family. Mr. Mauro explained that "to the extent there is a conflict or potential conflict[,] [Mr. Maughan] would waive both of those as to both lawyers."

¶16 The district court did not expressly speak to the issue of waiver in its memorandum decision. Considerations of waiver are, however, at the heart of the court's decision to permit Mr. Maughan to retain one of his two lawyers. In this appeal, we decide (1) whether it was proper for the district court to allow Mr. Maughan to waive a conflict at all, and (2) if it was within the court's discretion to permit waiver, whether Mr. Maughan's authority to waive the conflict was properly restricted to one and not both of his lawyers. Instead of framing its analysis of the State's motion to disqualify Mr. Maughan's lawyers in waiver nomenclature, the district court, in a memorandum decision, approached its task by applying a test it borrowed from *State v. Johnson*, 823 P.2d 484, 490 (Utah Ct.App.1991). The test balanced a "[d]efendant's right to be represented by an attorney of his choice against the need to maintain the highest standards of professional responsibility, the public concern in the integrity of the judicial process and the orderly administration of justice."

¶17 The district court cited the presence of "at least the reasonable possibility" that Mr. Maughan's lawyers committed "a serious violation of law or ethical standards" as its primary justification for disqualification. That the district court had misgivings over just how reasonable this possibility might be and about what the actual gravity of their transgressions were became evident when the court decided that Mr. Maughan's Sixth Amendment right to continue his association with his appointed counsel was important enough to save one, but not both, of his lawyers from disqualification despite their Spokane misadventures. Based upon the judge's ruling, Mr. Maughan decided to retain Mr. Mauro, and thus Mr. Williams was disqualified.

## ANALYSIS

### I. THE DISTRICT COURT'S RULING

¶18 The district court's ruling is susceptible to several interpretations. On one hand, it is clear that the district court believed that sufficient grounds existed to disqualify someone. At the same time, however, the district court concluded that the State had not made a sufficient case for discharging both Mr. Mauro and Mr. Williams since the court left it to Mr. Maughan to decide which of the two lawyers he would retain.

¶19 As noted above, this second aspect of the district court's ruling reflects what must have been apprehension over whether the lawyers' alleged misdeeds in Spokane justified disqualification. If the court's decision to disqualify someone was anchored to the belief that Mr. Mauro and Mr. Williams had materially jeopardized public confidence in the integrity of the judicial process and orderly administration of justice, the court would have been hard pressed to reconcile that rationale with a decision to allow one of the lawyers to continue on Mr. Maughan's behalf. If, on the other hand, the risk of a serious conflict of interest was the concern most responsible for the district court's ruling, by permitting Mr. Maughan to select one of his two lawyers to continue representation,

the district court signaled that the conflict was one that Mr. Maughan could likely waive.

¶ 20 Neither Mr. Maughan nor the State was happy with the district court's compromise ruling. Both insisted that the district court had overstepped the bounds of its discretion, albeit for different reasons. We, of course, are at liberty to affirm that compromise ruling to the frustration of both sides should we deem it proper to do so. Such an outcome would manifest a commitment to a grant of expansive deference to trial judges in a realm of judicial decision making that is uniquely marked by its demands on a judge's predictive power—will the events creating the alleged conflict ever surface in a way that is actually detrimental to the client?—as on the judge's fact-finding skills. We have previously found it proper to give trial judges considerable latitude in ruling on motions to disqualify counsel, drawing on the United States Supreme Court reasoning that " 'the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict.' " *State v. Arguelles,* 2003 UT 1, ¶ 88, 63 P.3d 731 (quoting *Wheat v. United States,* 486 U.S. 153, 162–63, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)).

### A. Abuse of Discretion

■ ¶ 21 The district court's decision to permit Mr. Maughan to select one of his lawyers to continue in his cause leads us to examine, with greater scrutiny than would typically be appropriate under the *Arguelles* standard, the nature and consequences of the conduct alleged to have merited the lawyers' disqualification. This modification of our standard of review, while necessary in our view, merits explanation.

¶ 22 At the outset, we reiterate that had the district court believed disqualification was required because of the risk that the lawyers' conduct posed to the integrity of the judicial process, the court would not have been justified in permitting either lawyer to remain as Mr. Maughan's counsel. The district court's ruling, then, can only be read to mean that the court concluded that the continuing representation of Mr. Maughan by either of his lawyers would not compromise

the integrity of the process. We hold that the district court did not abuse its discretion when it declined to disqualify Mr. Maughan's lawyers on this ground and affirm.

### B. Actual Conflict

¶ 23 The issue left for us to decide is whether the lawyers' Spokane misadventures created a real, present conflict of interest or a serious potential, future conflict of interest and, if it did, whether Mr. Maughan could waive any such conflict.

¶ 24 The State claims that the district court exceeded its discretion because the conflict brought on by the events in Spokane created an actual or potential conflict of interest that was both so real and so serious that Mr. Maughan was left powerless to spare either of his lawyers from disqualification. Mr. Maughan takes the opposite view. While he agrees with the State that the district court exceeded its discretion, he insists that there is nary an actual conflict to be found, and if a future one may be conjured, it is of little importance. These bipolar positions have one thing in common: they require us to examine the nature and extent of the alleged conflict.

¶ 25 The district court's memorandum decision said this about conflict of interest: "There is a potential conflict that examination of Mr. Wagar at trial might raise issues which implicate either Mr. Mauro or Mr. Williams to the Defendant's detriment." The district court did not elaborate about what these issues might be or how they might prejudice Mr. Maughan. It did, however, limit its findings concerning the conflict of interest to a potential conflict. We affirm the district court's determination that the conduct of Mr. Maughan's lawyers did not create an actual conflict of interest and turn our attention to reviewing the existence and nature of a potential conflict between Mr. Maughan and his lawyers.

### C. Serious Potential Conflict

■ ¶ 26 A conflict of interest exists for Sixth Amendment purposes if a lawyer's loyalties are divided in a way that "adversely affects counsel's performance." *Mickens v.*

*Taylor,* 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *see also State v. Lovell,* 1999 UT 40, ¶ 22, 984 P.2d 382. In other words, an actual or potential conflict threatens that " 'counsel [may] . . . make choices advancing other interests to the detriment of his client.' " *Taylor v. State,* 2007 UT 12, ¶ 124, 156 P.3d 739 (quoting *United States v. Alvarez,* 137 F.3d 1249, 1252 (10th Cir.1998)). Not all potential conflicts will justify the disqualification of counsel, and even some potential conflicts which might lead to disqualification of counsel may be waived. Only "serious potential conflicts" require disqualification without the possibility of waiver. *Arguelles,* 2003 UT 1, ¶ 88, 63 P.3d 731.

¶ 27 The State's characterization of the potential conflict in this case has two components. First, the State contends that Mr. Mauro and Mr. Williams would be so consumed by the effort to defend themselves against the accusations stemming from their Spokane activities that they would have inadequate time and interest in Mr. Maughan's cause. Next, the State claims that the circumstances of Mr. Mauro's arrest and the allegations of witness tampering would likely arise during Mr. Maughan's trial. According to the State, a jury would likely come to hold unfavorable impressions of Mr. Mauro and Mr. Williams upon hearing of their activities, to the detriment of Mr. Maughan.

¶ 28 The district court did not cite in its memorandum decision the first of these arguments as a basis for finding a potential conflict. We find the claim that the attorneys will suffer from divided loyalty based on the presumed temptation to surrender Mr. Maughan's defense to their own to be too speculative to merit consideration as a reason to disqualify the attorneys. It is true, as the State points out, that the attorney for Mr. Mauro and Mr. Williams complained that the Spokane police had "substantially interfered" with the efforts to represent Mr. Maughan. To the extent, however, that Mr. Mauro and Mr. Williams might be compelled to expend resources in their own defense, that redirection of resources creates no more or less of a conflict of interest than would the demands of representing other clients in the course of conducting a criminal defense practice. The determination of whether a lawyer is too limited by time and resources to provide effective legal assistance is one in which an adversary party is entitled to little say. It is, rather, a matter best left to the judgments of the lawyer and the client.

¶ 29 The district court noted as the sole potential conflict the claim that the circumstances surrounding Mr. Mauro's arrest and Mr. Williams' Spokane activities could surface to the detriment of Mr. Maughan during his trial. Despite the State's attempts to describe this conflict, we remain both unable to fully comprehend it and skeptical of the significance of those features that we can grasp.

¶ 30 In an effort to establish Mr. Wagar's bias in favor of Mr. Maughan, the State suggests that it may attempt to extract testimony from Mr. Wagar that he complied with Mr. Mauro's alleged admonition not to talk to the police. Even were we to assume that Mr. Wagar's allegiance to Mr. Maughan would not have been made so clear by the time the State embarked on this line of cross-examination that it would not have been merely cumulative, we see little justification to expand the inquiry to include the claim that the admonition was unlawful or unethical.

¶ 31 Moreover, every witness Mr. Mauro allegedly instructed not to talk to the Spokane police ultimately did so, and Mr. Williams' instructions to the witnesses on December 8 undoubtedly played a part. We therefore find it difficult to accept the claim that disclosure of the alleged unlawful instruction would result in the infliction of material damage to the credibility of either lawyer or that any impaired credibility sustained by the two lawyers would infect Mr. Maughan.

¶ 32 Despite our puzzlement and skepticism, we defer to the district court's finding that the events in Spokane might generate a potential conflict and do not conclude that it was clearly erroneous. Our assessment that the potential conflict is not serious enough as to render it beyond the power of Mr. Maughan to waive is likewise in accord with district court's approval of waiver implicit in

its decision to permit one of Mr. Maughan's lawyers to continue to represent him. We depart from the district court only to the extent that we hold that the potential conflict identified by the district court was of so little consequence that Mr. Maughan should have been afforded the opportunity to waive it with respect to both Mr. Mauro and Mr. Williams. We therefore remand this matter to the district court for the purpose of inviting Mr. Maughan's waiver of the potential conflict relating to his disqualified counsel, Mr. Williams.

## II. INSTRUCTIONS REGARDING WAIVER ON REMAND

¶ 33 We recognize the challenges that confront a district court when assessing whether a defendant has knowingly and voluntarily waived an attorney's potential conflict of interest. As we noted above, the specter of being whipsawed by claims of error no matter which way a judge rules is more than fanciful. We are "sensitive to the possibility that a defendant may seek a waiver and then try to use it to his or her advantage later." *State v. Johnson*, 823 P.2d 484, 491 (Utah Ct.App.1991).

¶ 34 We therefore instruct the district court on remand to appoint qualified conflict counsel to represent Mr. Maughan for the limited purpose of ascertaining whether Mr. Maughan desires to waive the potential conflict with respect to Mr. Williams and to ensure that Mr. Maughan's waiver is knowing and voluntary.

## CONCLUSION

¶ 35 We conclude that the district court did not abuse its discretion when it declined, based on implicit grounds, to find that Mr. Mauro's and Mr. Williams' continued representation would compromise the integrity of the judicial process or constitute an actual conflict of interest. Although we appropriately defer to the district court's determination that a potential conflict might exist, we conclude that any potential conflict is not so serious that Mr. Maughan could not waive it. We therefore reverse and remand for proceedings consistent with this opinion.

Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.