STATE OF NEBRASKA, APPELLEE, V.
CLIFFORD J. DAVLIN, APPELLANT.
639 N.W.2d 168

Filed February 12, 2002.   No. A-00-698.

James R. Mowbray and Nancy K. Peterson, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HANNON, INBODY, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

Clifford J. Davlin was convicted of first degree sexual assault on a child, use of a weapon to commit the crime, and of being a habitual criminal. He was sentenced to a total of 25 to 35 years' imprisonment on all convictions. His convictions and sentences were affirmed on direct appeal by a memorandum opinion. See *State v. Davlin*, 3 Neb. App. xiii (case No. A-94-505, Feb. 28, 1995). Later, Davlin filed a second amended motion for post-conviction relief, alleging he was denied due process and effective assistance of counsel in the district court's denial of his request for substitute counsel without a hearing and effective assistance of counsel both at trial and upon his direct appeal. He appeals from the denial of that motion. We conclude Davlin's due process rights were violated by the trial court's refusal to inquire into his dissatisfaction with court-appointed counsel, and therefore, we reverse, and remand for a new trial.

## BACKGROUND

After Davlin was charged, Thomas J. Garvey, Sarpy County public defender, was appointed to represent Davlin, and Davlin pled not guilty. Shortly before trial, Davlin complained in a letter to the trial judge about the representation he was receiving. The judge refused to consider his complaint, but told him that if he discharged Garvey, another lawyer would not be appointed. Davlin elected to keep Garvey. A few days later, the jury trial was held, with Garvey representing Davlin.

*Evidence at Original Trial.*

During a jury trial which was held on March 14 and 15, 1994, 15-year-old M.D. testified that on November 20, 1993, she was hitchhiking in Lincoln, when Davlin picked her up. She told him that she needed a ride to Omaha. After she got in Davlin's car, they went to a bar, where he bought an alcoholic drink for himself and for her. Davlin suggested that she stay overnight at his

apartment and that they would go to Omaha in the morning. M.D. agreed, and he took her to his apartment, where she showered and attempted to sleep on the couch. Three times during the night, Davlin came out of his room and stood naked in front of M.D. while she pretended to be asleep.

They left for Omaha the next morning, via Syracuse and Nebraska City, Nebraska. After crossing a bridge, Davlin said he wanted to visit some friends and turned off the two-lane highway onto a gravel road with hills. They then drove over a dirt road past a Sarpy County sign, and Davlin stopped near an abandoned house. M.D. testified that she attempted to get out of the car when Davlin made an advance on her, but he pulled a knife and told her to get back in the car. He then ordered her to perform oral sex on him and ejaculated in her mouth, which she testified she spit out upon the floor of the car. After making M.D. undress, Davlin digitally penetrated her rectum and had oral sex and vaginal intercourse with her. Then he drove her to Bellevue, Nebraska, where he dropped her off near a school and some apartment buildings and told her to return there in 4 hours so he could pick her up or he would come looking for her.

M.D. went to the nearest store and had the police called. A police officer was dispatched at approximately 11:35 a.m. and met M.D. at a store in Omaha. This officer took M.D. to a hospital, where she was given a complete physical examination and samples were taken for a sexual assault kit.

The physician who examined her testified that by palpations both through the vagina and the abdominal wall, she detected tenderness in the lower right quadrant of M.D.'s abdomen, which is consistent with aggressive sexual intercourse. A nurse's notes documented that M.D. complained of lower abdominal and anal pain.

An investigator with the Sarpy County sheriff's office testified that M.D. directed him to the site of the assault and to Davlin's apartment in Lincoln. She identified Davlin as her attacker from a photographic array and again in court. In searching Davlin's car and apartment pursuant to a warrant, the police found a knife in the car. Tattoos on Davlin's body fit those described by M.D. as being on her attacker. The investigator testified that Davlin's date of birth is May 15, 1953.

Vicky Cowan, a forensic serologist, testified about her examinations of hair and blood samples from M.D. and Davlin as well as swabs taken in the sexual assault kit. Forensic serology involves analyzing items of evidence for the presence of body fluids and then attempting to individualize the body fluids with the use of genetic markers. Cowan concluded that the donor of the semen present in the swab taken from the sexual assault kit may have had the same blood type as Davlin, type A, or may have had blood type AB. She further concluded that Davlin did not match the genetic marker "PGM" found in the vaginal swab and testified that no PGM marker was identified from the genital swab or the dried secretions. Cowan testified that this did not necessarily exclude Davlin as the donor. A comparison of hair samples taken from M.D. and Davlin to hair samples found in Davlin's car led Cowan to conclude that hair samples found in the car were microscopically consistent with known pubic hairs of both individuals.

A friend of Davlin's testified that Davlin visited her at her apartment in Lincoln on November 21, 1993, at about 3:10 p.m. When she was in his car that day, he produced a knife from underneath the seat to help her get a cigarette loose from the window. He told her he had been to Omaha over the weekend because his father had had a heart attack. She stated that he later changed his story and said that he had never been in Omaha.

An investigator testified that he interviewed Davlin. He testified that Davlin admitted that he met M.D. on November 20, 1993, and took her to a bar and then to his apartment, where she took a shower. He claimed he dropped her off at a truckstop that same night and denied sexually assaulting her. The investigator testified that Davlin admitted he had a knife in his car, but did not know how M.D. could have seen it.

*Verdict, Sentence, and Direct Appeal.*

The jury returned verdicts of guilty on March 15, 1994. An evidentiary hearing on the habitual criminal charge was held on March 17, and Davlin was determined to be a habitual criminal on March 21, which enhanced his sentences. At his sentencing on May 6, Davlin said that he should not be sentenced for the crimes he was convicted of because his attorney declined to

have appropriate DNA testing done and did not put up a defense. Davlin was sentenced to 15 to 25 years' imprisonment on the sexual assault conviction and a consecutive 10 years' imprisonment on the weapons conviction.

In his direct appeal, Davlin was represented by Gregory A. Pivovar, assistant public defender for Sarpy County. Two errors were assigned: The trial court erred (1) in sustaining the State's motion in limine excluding M.D.'s juvenile court record thereby denying Davlin the right to confront and cross-examine witnesses and (2) in finding the evidence sufficient to establish guilt beyond a reasonable doubt. This court affirmed the trial court's decision by memorandum opinion. See *State v. Davlin*, 3 Neb. App. xiii (case No. A-94-505, Feb. 28, 1995).

*Postconviction Motion.*

Davlin later filed a second amended motion for postconviction relief and was represented on that motion by lawyers from the Nebraska Commission on Public Advocacy. In summary, restated, he alleged in his operative motion (1) that the court denied his right to due process of law and to effective assistance of counsel by denying his pretrial request for substitution of counsel; (2) that he was denied effective assistance of counsel at trial by counsel's allowing without objection a jury instruction that incorrectly told the jury (a) that one of the elements of the offense of first degree sexual assault was that M.D. was 16 years of age or younger, when the statutory language states less than 16 years of age, (b) that one of the elements of the use of a weapon to commit a felony was that he used or possessed a knife during the commission of the offense, and (c) that one instruction linked the use of a weapon charge to a strict liability offense, to-wit: statutory rape; (3) that he was denied effective assistance of counsel in preparation for trial by his counsel's (a) failing to investigate, (b) not obtaining DNA testing of body fluids and hair collected as evidence to show the samples were not from him, (c) not obtaining the odometer reading on his recently purchased automobile to show he could not have gone to Sarpy County by the circuitous route claimed by M.D., (d) not having his automobile screened for body fluids to show the absence of semen and body fluid which M.D.'s testimony indicated should be there; and (4) that he was denied

effective assistance of counsel during trial by counsel's (a) failing to object under Neb. Rev. Stat. § 27-404 (Reissue 1995) to the evidence of other alleged wrongful acts, to wit, that he procured an alcoholic beverage for M.D., (b) failing to impeach M.D. by cross-examination concerning inconsistencies between her deposition testimony and her trial testimony, (c) failing to object to the evidence on the possible similarity of hairs when such evidence has been recognized as unreliable and inadmissible under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), thus preventing an appeal on that issue, and (d) failing to object to the documents introduced to establish the habitual criminal charge because they do not have the proper judicial signature to certify Davlin was convicted by a judge and sentenced in Iowa to at least 1 year's imprisonment. The above is only a summary of the allegations in the motion and is not a complete recitation of the factual allegations of the motion.

*Postconviction Hearing.*

At the March 27, 2000, hearing on the motion, Davlin testified by deposition that he had been incarcerated since November 23, 1993. The evidence showed that Garvey did not meet with Davlin more than three times before the trial; that Davlin wrote Garvey and telephoned him numerous times, but received no letter in reply; and that the only tests done by the state laboratory were two serology tests. In reference to the first serology test, dated January 10, 1994, Davlin said that Garvey told him that "the [S]tate didn't have anything on me, that the lab reports showed negative. . . . [J]ust relax." Davlin testified that after he received the laboratory's report on the second testing, dated February 23, 1994, he asked Garvey if they could have some independent testing done. Davlin was incarcerated and could not pay for the DNA testing himself. He claimed Garvey said that "he was not going to spend 40,000 fucking bucks on me to prove me innocent." During the direct appeal, he brought the issue of DNA testing to Pivovar's attention. He was told by Pivovar that Pivovar could only raise issues his boss, Garvey, told him to raise. Davlin wrote letters complaining about the lack of DNA testing in his case to the director of the state laboratory, to the Governor, and to the judge.

Davlin also testified that he asked Garvey to investigate the mileage on his car, because he purchased the car about 3 days before the alleged incident (he "believe[d] it was on the 19th" of November that he purchased it) and the mileage would have shown he could not have driven from Lancaster County to Sarpy County via Syracuse and Nebraska City and back as M.D. testified. After he read M.D.'s deposition and police reports, he asked Garvey to have the car inspected for the semen which M.D. claimed to have spit out or any evidence related to a sexual assault. Garvey did not reply to the request.

Davlin testified that he did not trust Garvey and that Garvey treated him with disrespect. At one point in front of two other inmates, Garvey gave him police reports and said that "here's your fucking police reports and shut the fuck up and quit crying." Davlin testified that he was shocked and devastated. Davlin also said in his deposition that Garvey would always ask, "[D]idn't you say you had consensual sex with her," and that Davlin would have to remind him that he never had any sex with M.D.

Davlin testified that he wrote a letter to the Nebraska State Bar Association on March 7, 1994, regarding his dissatisfaction with the services of Garvey. On April 27, before Davlin had been sentenced, Garvey responded to the Nebraska State Bar Association and wrote, "[Davlin's] insistence on my spending taxpayer's dollars for further DNA testing I deemed unnecessary as he was not excluded by the DNA testing." (The record shows that no DNA testing had been performed at that time.) Garvey further admitted to the bar association that he told Davlin to "shut up" on numerous occasions, but stated he did so because he did not wish to listen to the irrelevant information Davlin was stating to him.

Davlin testified that he wrote a letter to the judge, requesting the court to provide substitute counsel. A copy of that letter was introduced into evidence. During a hearing on the State's application to endorse witnesses held on March 11, 1994, the judge referred to having received a four-page letter from Garvey. A more complete summary of this colloquy from the record made at the time will be given later when we consider the issue. In substance, the judge stated he had not read and would not read the entire letter and, without any inquiry into the matter, told Davlin he would have to represent himself if he discharged Garvey.

Davlin maintained that even after his conviction, he tried to have the items of evidence in his case tested for the presence of DNA. In a letter to the Nebraska State Bar Association dated May 21, 1994, Davlin claimed that he contacted Garvey about DNA testing after his incarceration and that Garvey responded, " 'There won't be any DNA tests done now or any other time either.' " The record shows the only evidence which could have been subjected to DNA testing was destroyed, without a court order, on January 24, 1996.

Davlin's counsel from the Nebraska Commission on Public Advocacy produced the deposition of Charlotte Word, the deputy laboratory director for Cellmark. Cellmark does DNA identification testing and would have been available for DNA testing in the fall of 1993. Word stated that any testing conducted would depend on the size (i.e., how much sperm was present) and quality of the sample. She estimated that back in 1993 or 1994, tests could easily have been done for $1,500 to $2,000.

*Trial Court's Ruling on Motion.*

The State presented no evidence at the hearing. The district court rendered its decision on Davlin's motion by a formal opinion in which it reviewed the authorities it thought should apply in determining claims of ineffective performance of counsel raised in postconviction proceedings. It then considered the burdens imposed on Davlin by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* holds that to establish that a defendant was denied effective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced thereby. See *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000). The trial court noted that the State did not offer any evidence or even call Garvey as a witness and concluded that Davlin requested Garvey have DNA testing done, have his vehicle's odometer checked, and have his vehicle screened for body fluids; that his requests were met with refusals, silence, or inaction; that Davlin's requests were reasonable; and that absent some showing of a reasonable basis for refusal, Garvey's failure to do so fell below the minimum standard and that Garvey's response lacked the civility that even the most difficult client should expect.

Nonetheless, the court concluded that the second prong of the *Strickland* test applied and that Davlin had failed to show prejudice. It separately considered Davlin's complaints of ineffective assistance of counsel based upon action or the lack thereof during trial and during appeal. It concluded that these actions were within a trial lawyer's discretion and that the *Strickland* test was not satisfied. It denied the motion, and Davlin appeals. When relevant, further details of the order will be stated.

### ASSIGNMENTS OF ERROR

Davlin alleges that he was (1) denied effective assistance of counsel and due process in the district court's disposition of his request for substitute counsel and (2) denied effective assistance of counsel at trial and on direct appeal.

### STANDARD OF REVIEW

■ The denial of a motion for substitution of counsel is reviewed for an abuse of discretion. See *State v. McPhail*, 228 Neb. 117, 421 N.W.2d 443 (1988). See, also, *U.S. v. Adelzo-Gonzalez*, 268 F.3d 772 (9th Cir. 2001); *U.S. v. Smith*, 62 F.3d 1073 (8th Cir. 1995); *State v. Bronson*, 122 Or. App. 493, 858 P.2d 467 (1993); *State v. Valencia*, 27 P.3d 573 (Utah App. 2001). Compare *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (stating that under Sixth Amendment jurisprudence, state trial court has no discretion to ignore indigent defendant's timely motion to relieve appointed attorney).

■ A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous. *State v. Caddy*, 262 Neb. 38, 628 N.W.2d 251 (2001).

### ANALYSIS

■ For relief to be granted under Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 1995), the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution. *State v. Caddy, supra.* Davlin argues that two of his constitutional rights were violated: (1) his right to due process of law by the court ruling on his motion to substitute counsel without a hearing and (2) his right to effective assistance of counsel by his court-appointed counsel's action. We

conclude that the failure of the trial court to inquire as to the basis for Davlin's dissatisfaction when he moved for substitution of counsel denied Davlin his right to due process and requires Davlin's convictions and sentences be set aside and a new trial ordered. We therefore do not consider the second issue.

Davlin's convictions were affirmed on appeal. A motion for postconviction relief cannot be used to secure review of issues which could have been litigated on direct appeal. *State v. Hess*, 261 Neb. 368, 622 N.W.2d 891 (2001). When the record reflects that a defendant had different counsel on his or her direct appeal from counsel representing him or her at trial, any issues that could have been raised during direct appeal, but were not raised, are not properly preserved for review in a motion for postconviction relief based upon ineffective assistance of trial counsel. *State v. Billups*, 10 Neb. App. 424, 632 N.W.2d 375 (2001).

The record in the instant case discloses that Garvey, public defender for Sarpy County, defended Davlin at the trial level and Pivovar, assistant public defender for Sarpy County, handled the direct appeal. Davlin testified that at the time the appeal was being prepared, Pivovar told him he could only raise the issues on appeal that Garvey would allow him to raise. In *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000), Soukharith was similarly represented both at trial and on direct appeal by lawyers employed by the office of the Sarpy County public defender. The Nebraska Supreme Court found that when the same attorney represents a defendant at trial and on direct appeal, the first opportunity to assert ineffective assistance of trial counsel is in the motion for postconviction relief. *Id.* We use *Soukharith* as a guide and find that Davlin's claims are not procedurally barred.

*Court's Disposition of Request for Substitute Counsel.*

Davlin claims that he was denied effective assistance of counsel and due process in the trial court's disposition of his request for substitute counsel without an adequate hearing. His trial was set to begin on March 14, 1994. The transcript shows that on March 11 a letter from Davlin to the judge dated "3-9-94" was filed in the case file. This letter contains allegations of Garvey's failure to take actions that Davlin requested him to take, including the request for further testing of the body fluids, and of

Garvey's attitude, his refusal to answer Davlin's correspondence, his vulgar remarks toward Davlin, and his statement when he denied Davlin's request for DNA testing.

At a March 11, 1994, hearing on a motion by the State to endorse witnesses, the judge acknowledged receipt of the letter. He said that he had not read Davlin's letter in its entirety and did not want to get into the things requested. The judge stated that from the letter, he had gathered that Davlin was writing to express dissatisfaction with Garvey as his counsel and a desire to have him terminated as his counsel. The judge told Davlin that if the court granted his request and discharged Garvey, there would not be another lawyer appointed. The judge also stated that he was not going to respond to letters coming out of the county jail and that things such as discharging a lawyer should come in appropriate pleadings. The court informed Davlin that whether there was meaningful representation is an issue that cannot be decided until after the fact and that if the public defender's office does not afford meaningful and competent representation, Davlin may be entitled to have any conviction that results set aside and receive another trial. Davlin stated that he was not capable of representing himself and that he would continue with Garvey.

█ It is well settled in Nebraska that mere distrust of, or dissatisfaction with, a court-appointed attorney is not a sufficient reason to require appointment of substitute counsel. *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001); *State v. Rosales*, 3 Neb. App. 26, 521 N.W.2d 385 (1994). " 'When a defendant becomes dissatisfied with court-appointed counsel, unless the defendant can show good cause to the court for the removal of counsel, his or her only alternative is to proceed pro se if competent to do so.' " *State v. Dunster*, 262 Neb. at 353, 631 N.W.2d at 900, quoting *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000).

█ Davlin's counsel relies upon *Smith v. Lockhart*, 923 F.2d 1314 (8th Cir. 1991). The principle stated in the *Lockhart* case that is most significant is:

> When a defendant raises a seemingly substantial complaint about counsel, the judge "has an obligation to inquire thoroughly into the factual basis of defendant's

dissatisfaction." [Citations omitted.] The trial court must make the kind of inquiry that might ease the defendant's dissatisfaction, distrust, or concern. [Citation omitted.] That inquiry should be on the record.

*Id.* at 1320.

In its order denying postconviction relief on this issue, the trial court recognized that the *Lockhart* case would support the proposition contended by Davlin's counsel, but it distinguished the cases. It did so by stating that in *Lockhart*, the defendant did not accept the counsel who had a conflict. We interpret this to mean that the court felt Davlin waived a hearing on his expressed dissatisfaction with counsel by not discharging Garvey and defending himself pro se. The court also stated in its order denying the motion for postconviction relief that "although there was obviously a conflict of personalities between Garvey and Davlin, Davlin's contentions in wanting Garvey replaced were all premised on actions or conversations by Garvey with which Davlin disagreed."

The State argues that "if Davlin had effective assistance of counsel at trial, it follows that he suffered no prejudice from the trial court's disposition of his request for substitute counsel." Brief for appellee at 10. The State then goes through the several actions of Davlin's counsel during trial and relies upon the trial court's separate findings with respect to them. The argument ignores the fact that those alleged deficiencies of representation had not occurred when Davlin expressed dissatisfaction with Garvey and that the trial court found that Garvey's failure to respond to Davlin's reasonable requests fell short of the minimum standard for counsel and his lack of civility was less than the most difficult client could expect. From that finding, the trial court then went on to consider the second prong of the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as applied to Garvey's failure to do the things Davlin had requested. The order can only be interpreted as a finding that the first prong of the *Strickland* test had been satisfied with respect to Garvey's performance at the time Davlin moved to dismiss him.

The State also argues that the request for substitute counsel was not properly before the court because Davlin did not file a

formal motion. This point was mentioned by the trial court during the proceeding wherein the trial court refused to consider Davlin's dissatisfaction. We shall consider this issue later. The State also argues this case is distinguishable from *Lockhart*, because the trial court found as a matter of law that there was "no conflict of interest." Brief for appellant at 21. In the *Lockhart* case, the dissatisfaction grew out of a claim that counsel had a conflict of interest. Apparently, the State feels that the principle stated in *Lockhart* applies only to dissatisfaction arising from a feared conflict of interest. The case does not so state, and the cases we cite below apply the principle to situations other than to a conflict of interest.

The State also argues that the court could not consider the issue of pretrial satisfaction because a trial court must not interfere with the counsel's conduct of a legal defense. The trial court stated this proposition in its opinion and cited *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989), to support it. We agree that *Ryan* indicates the existence of that rule. However, the *Ryan* court's discussion on the subject related to the trial judge interfering during the actual trial, and it has no application to the consideration of a pretrial motion to substitute counsel. In our view, the *Ryan* case teaches nothing about a trial judge's duty to inquire upon learning that a defendant is dissatisfied with his attorney.

Heretofore, we have discussed the proposition from *Smith v. Lockhart*, 923 F.2d 1314 (8th Cir. 1991), as though that is the only case which has considered the proposition. There are several cases that recognize the rule and apply or refuse to apply the principle depending on the facts in the particular case. We shall review a number of these cases in order to benefit from their teaching before we apply the questioned principle to the facts in this case.

The Eighth Circuit revisited the issue in *U.S. v. Smith*, 62 F.3d 1073 (8th Cir. 1995), where the defendant requested new counsel, the judge questioned her on the morning of the trial, and she said that "there were 'some issues' on which she and her attorney did not 'see eye-to-eye.'" *Id.* at 1076. The motion was denied, and after she was convicted, she renewed her motion for substitution of counsel. An evidentiary hearing was held that time, and the motion was denied. The court recognized that a

defendant asking for substitute counsel had the burden to show justifiable dissatisfaction and that the defendant did not make the necessary showing in that case.

■ Other federal courts have followed this rule. See, *U.S. v. Adelzo-Gonzalez*, 268 F.3d 772 (9th Cir. 2001) (trial court's judgment was reversed though it had made inquiries and then denied substitute counsel, because it had abused its discretion by making inadequate inquiry and failed to recognize serious breakdown in trust and communication between client and attorney); *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (stating that it is well established and clear that Sixth Amendment requires on record appropriate inquiry into grounds for motion requesting substitute counsel and that matter be resolved on merits before case goes forward); *King v. Rowland*, 977 F.2d 1354 (9th Cir. 1992) (stating inquiry need only be as comprehensive as circumstances permit); *Hudson v. Rushen*, 686 F.2d 826, 830 (9th Cir. 1982) (where state trial court's inquiry was held to be "an adequate and fair hearing" and as comprehensive as circumstances reasonably would permit); *Sagin v. Hill*, No. C98659S IPR, 2000 WL 194809 (N.D. Cal. Feb. 15, 2000) (holding colloquy between judge and defendant where defendant was allowed to explain his problem with counsel and unequivocally indicated he did not want to discharge his attorney wholly satisfied judge's duty to inquiry). As stated in *U.S. v. Blum*, 65 F.3d 1436, 1441 (8th Cir. 1995): "A request for substitute counsel is not a complex legal or procedural undertaking. Once the request is made, the court has a duty to inquire into the factual basis of the defendant's dissatisfaction."

In *State v. Richardson*, 256 Kan. 69, 883 P.2d 1107 (1994), the Kansas Supreme Court recognized the trial court's duty to inquire when it became aware of a conflict between the defendant and counsel, but held in that case the trial court did not abuse its discretion when it denied appointment of substitute counsel after it asked the defendant to explain why he was dissatisfied with counsel. In *State v. Simpson*, 29 Kan. App. 2d 862, 32 P.3d 1226 (2001), it was held the trial court abused its discretion when the record indicated a potential conflict and it did not more fully inquire into the defendant's alleged problems with counsel.

In *State v. Lovell*, 984 P.2d 382 (Utah 1999), the Supreme Court of Utah recognized the rule that when a defendant

expresses dissatisfaction with counsel, the trial court must make reasonable efforts to determine the nature of the defendant's complaint. That court noted that it is not reversible error to fail to inquire when the complaints "do not rise to a constitutional level requiring the appointment of new counsel." *Id.* at 389. In *Lovell*, the court concluded the failure to inquire was harmless error because there was nothing to suggest that the outcome would have been different if different counsel had been appointed. In *State v. Valencia*, 27 P.3d 573, 576 (Utah App. 2001), the Utah appeals court concluded that the trial court erred in not conducting a more meaningful inquiry into the defendant's complaints when it asked only a very few questions to " 'explore the substantiality of [Valencia's] allegations.' " The appellate court determined that the error was harmless because the record contained enough information to support the trial court's finding that good cause to substitute counsel did not exist.

■ In *State v. Coffey*, 158 Or. App. 112, 972 P.2d 1219 (1999), the defendant wrote a letter to the judge complaining that his court-appointed attorney had done only one thing on his case, had not contacted any potential alibi witnesses, and otherwise refused to communicate with him. The judge sent copies of the letter to the attorneys but made no inquiry. Later, the judge granted the State's motion to exclude the alibi evidence, and in a hearing on this matter, the defense counsel admitted facts showing he did not contact the defendant. The *Coffey* court stated, by way of a quote, that a " 'defendant's complaint about court-appointed counsel, when based on proper grounds, implies an abridgement of the constitutional right to assistance of counsel. . . .' " 158 Or. App. at 115, 972 P.2d at 1220. The *Coffey* court held that the defendant's letter explicitly identified particular complaints about the adequacy of representation and that the trial court did not inquire further and therefore did not satisfy its affirmative duty. The conviction was reversed, and the cause was remanded for a new trial.

■ In *Coffey*, the prosecution argued that the court had no obligation to inquire into the defendant's pretrial complaint because it was contained in a letter rather than a formal motion. The *Coffey* court stated that "to insist that defendant could procure the removal of his noncommunicative attorney only by having the

same attorney file a motion for appointment of substituted counsel would be illogical and impractical." 158 Or. App. at 116, 972 P.2d at 1221.

In *State v. Grcich*, 148 Or. App. 337, 939 P.2d 649 (1997), before trial, the defendant asked for new counsel, the appellate court found that the trial court's inquiry fell below the required standard, and the cause was remanded for a new trial. In that case, when the defendant stated he did not feel his attorney was helping him at all, the judge did not pursue the inquiry, and his statements and questions indicated he assumed the defendant was at fault. The judge admonished the defendant to behave and stated that the only way he would appoint a new lawyer was if he revoked the defendant's release status and sent him to jail.

In another case, the Oregon appellate court said, "The court's failure to inquire into the nature of the conflict and evaluate the merits of the request for a different attorney was reversible error, because the court had 'no basis on which to determine whether [defendant's] constitutional right to effective counsel was being honored.'" *State v. Bargas-Perez*, 117 Or. App. 510, 513, 844 P.2d 931, 932 (1992). Further, when a statement of reasons for dissatisfaction with the attorney is required, the defendant's statement must be on the record. *State v. Bronson*, 122 Or. App. 493, 858 P.2d 467 (1993) (where new trial was granted because record did not disclose specific concerns and conflicts, but did show trial court had inquired off record).

In *State v. Gallagher*, 288 Mont. 180, 955 P.2d 1371 (1998), and *State v. Weaver*, 276 Mont. 505, 917 P.2d 437 (1996), the Montana court held that the trial court's inquiries were inadequate to determine the validity of the defendants' complaints. Both *Gallagher* and *Weaver* were remanded for determinations of the validity of the defendants' complaints and for new trials if the complaints were determined to be valid.

██ The following is the most complete statement of the rule that we found:

> [W]here a defendant, before the commencement of trial, makes it appear to the trial judge that he desires to discharge his court appointed counsel, the trial judge, in order to protect the indigent's right to effective counsel, should make an inquiry of the defendant as to the reason for the

request to discharge. If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute.

*Nelson v. State*, 274 So. 2d 256, 258-59 (Fla. App. 1973).

We think that generally, Nebraska judges have followed this practice. For example, in *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *State v. Clark*, 216 Neb. 49, 342 N.W.2d 366 (1983), and *State v. Davis*, 6 Neb. App. 790, 577 N.W.2d 763 (1998), the trial courts each learned of the defendant's dissatisfaction with counsel, orally in the first two cases and by written motion in the last one, and each time the trial court allowed the defendant to state his reasons. In *Bjorklund*, the prosecutor and public defender were allowed to state facts disputing Bjorklund's assumptions. Bjorklund maintained the trial court should have held an evidentiary hearing, but the Nebraska Supreme Court said the court held all the hearing that was necessary. The trial court's denial of substitute counsel was upheld because the reasons stated were held to be inadequate. We find no case which implies that the trial court should not inquire when a defendant expresses dissatisfaction with his court-appointed counsel.

In the case at hand, the trial judge's statement on the record at the time the dissatisfaction was brought to his attention shows that he had not read the letter containing Davlin's complaints, that he informed Davlin that he was not going to act on the letter, and that he did not want to get into the matters raised in the letter. The judge went so far as to state that if Davlin's court-appointed attorney failed to afford meaningful and competent representation, he would be entitled to have any conviction set

aside and to get another trial, but if he discharged Garvey, Davlin would have to represent himself.

In this case, the trial court stated to Davlin at the March 11, 1994, hearing that "[t]hose things [complaints about counsel] should come in with appropriate pleadings if you want to discharge a lawyer or do other things." Like the Oregon court in *State v. Coffey*, 158 Or. App. 112, 972 P.2d 1219 (1999), we think it is impractical to expect an incarcerated defendant to draft a formal pleading to discharge the only lawyer available to him. While the document Davlin sent was a letter, except for lacking a caption, it would clearly serve as a pro se motion, and it was better drafted than most such pro se documents we see.

This case is somewhat unique in that in the postconviction proceeding, the trial judge found Davlin's pretrial complaints to be reasonable and the conduct of the lawyer to be below standard with respect thereto. We also conclude that this is not a case like *State v. Lovell*, 984 P.2d 382 (Utah 1999), where the record showed the defendant's complaints were unsubstantial. In the case at hand, we cannot read the trial court's order as anything but a finding that Garvey's pretrial conduct was ineffective assistance of counsel.

The trial court concluded that Davlin failed to show prejudice as is required by the second prong of the test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The trial court also concluded that it was a difficult question, but that the circumstances were not such as to entitle Davlin to a presumption of prejudice as recognized in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), and *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000). The *Cronic* rule as summarized by the Nebraska Supreme Court in *Trotter*, is as follows:

> Pursuant to *Cronic*, under certain specified circumstances, prejudice to the accused is to be presumed. The text of *Cronic* lists the following three circumstances in which prejudice will be presumed: (1) where the accused is completely denied counsel at a critical stage of the proceedings, (2) where counsel fails to subject the prosecution's case to meaningful adversarial testing, and (3) where the surrounding circumstances may justify a presumption

of ineffectiveness without inquiry into counsel's actual performance at trial. According to footnote 28 in *Cronic*, it appears that prejudice will also be presumed where there is an actual conflict of interest among multiple defendants jointly represented by the same counsel.

259 Neb. at 218, 609 N.W.2d at 38. But, here, the trial court merely stated without explanation that whether the circumstances justify the presumption of prejudice provided for in *Cronic* "is a close call, but one I make in favor of the State."

The *Trotter* opinion states that the trial court had found that Trotter had failed to show there was a reasonable probability that absent his counsel's failure to perfect his appeal in the required manner, the result of the appeal would have been different. The Supreme Court reversed the judgment after stating it found as a matter of law that Trotter was denied his constitutional right to effective assistance of counsel and was entitled to postconviction relief. We therefore conclude that whether or not circumstances justify the presumption of prejudice provided for in *Cronic* is a question of law.

The question of the pretrial motions for substitute counsel in the above-cited cases arose in a number of ways. Several were by direct appeal. *Smith v. Lockhart*, 923 F.2d 1314 (8th Cir. 1991), on the other hand, was a habeas corpus case where the state court had affirmed the conviction and the federal district court denied the writ. The Eighth Circuit Court of Appeals reversed, and remanded the cause without considering whether the defendant was prejudiced. In *State v. Gallagher*, 288 Mont. 180, 955 P.2d 1371 (1998), the Montana Supreme Court reversed the lower court's decision for a hearing on and a determination of the validity of the defendant's complaint and for a new trial if the complaint was found to be valid. In *Hudson v. Rushen*, 686 F.2d 826 (9th Cir. 1982), the federal district court had granted the writ of habeas corpus, and upon appeal, that order was reversed because the trial court's inquiry was determined to be adequate. In *Nelson v. State*, 274 So. 2d 256 (Fla. App. 1973), the appellate court granted the requested relief by vacating the conviction and sentence and ordering a new trial. The other cases were on direct appeal and, when the inquiries were found to be inadequate and the reasons stated to be substantial, the convictions were reversed and new trials ordered.

In *Lockhart, supra,* the court concluded that the defendant was denied counsel during a critical stage of the proceedings because after Lockhart had been denied the hearing, he represented himself at an omnibus hearing which was considered a critical stage of the proceedings. This appears to be within the first of the circumstances listed in *Cronic* where prejudice will be presumed, but no reference was made to that case. Neither *Lockhart* nor any of the cases discuss any requirement of prejudice in analyzing the denial of substitute counsel. We conclude this is because the failure to inquire into a defendant's dissatisfaction with counsel is a denial by a court of the effective assistance of counsel, that is, a denial by a court of due process.

For a defendant to be required to go to trial with counsel the defendant finds unsatisfactory or to try his or her case pro se when before trial facts exist which, if the court knew of them, would show that the defense counsel had a conflict of interest, that communication between counsel and the defendant had completely broken down, or that counsel has refused upon request to take reasonable steps to present or discover evidence that would be helpful, would in effect be requiring the defendant to be represented by ineffective counsel. When a defendant is deprived of a pretrial opportunity to disclose any such shortcoming to the court, that defendant is being deprived of due process. This situation is distinct from where appointed counsel might not have been effective during trial because in the former situation the court might be able to prevent the defendant from being deprived of his or her right to counsel at every significant step of the proceedings. That deprivation requires a new trial.

The evidence also shows that without judicial approval, the evidence which would have been subject to DNA testing was destroyed. The trial court seemed to take this as conclusively establishing that Davlin could not show prejudice. The effect of the destruction of the evidence, if any, is something which can be litigated in the retrial.

## CONCLUSION

We therefore reverse Davlin's convictions and sentences and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.